UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COVANTAGE CREDIT UNION, | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) No. |
| | ) |
| LAKE RIDGE FINANCIAL CORP.; | ) |
| WINDYCITYJAY TRUCK SALES, | ) |
| INC.; and JASON R. DESANTO, | ) |
| individually and as Trustee of the JASON | ) |
| R. DESANTO 2015 LIVING TRUST, | ) |
| DATED 9/1/2015, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff CoVantage Credit Union ("**CoVantage**"), through its attorneys Cohen, Salk & Hoffman, P.C., hereby alleges for its complaint against defendants Lake Ridge Financial Corp. ("**Lake Ridge**"), WindyCityJay Truck Sales, Inc. ("**WCJ**") and Jason R. DeSanto ("**DeSanto**"), individually and as Trustee of the Jason R. DeSanto 2015 Living Trust dated 9/1/2015 (the "**Trust**") as follows:

### Nature of the Claims

1.  This case arises out of a series of loans made by CoVantage to Lake Ridge. The purpose of the loans was to provide funds to Lake Ridge to be used in financing tractor trailer truck sales and leases by its affiliate WCJ to its customers. The loans were to all be secured by exclusive liens on the tractor trailers financed by Lake Ridge, thus providing CoVantage with important and valuable collateral for the loans it made to Lake Ridge.

2.  Fifty-seven of the loans (collectively, the "**Loans**"), which were all guaranteed by WCJ, DeSanto and the Trust, are in default for failure to pay the amounts due and owing thereunder. To make matters worse, CoVantage has learned that, contrary to the terms of the loan

documents signed by DeSanto on behalf of Lake Ridge and the representations DeSanto repeatedly made to CoVantage, on 35 of the 57 Loans at issue there are other lien claimants to the collateral securing the Loans. As a result, CoVantage has been frustrated in its efforts to recover from its collateral.

3. CoVantage now brings breach of contract claims against Lake Ridge on the Promissory Notes it signed and against DeSanto, WCJ and the Trust on the Commercial Guarantees they executed. In addition, CoVantage brings a fraud claim against DeSanto based on his misrepresentations regarding the liens on the collateral securing 35 of the Loans.

**Parties**

4. CoVantage is a Wisconsin-chartered, federally insured credit union with its principal place of business in Wisconsin. CoVantage is a citizen of Wisconsin for diversity of jurisdiction purposes.

5. Lake Ridge is an Illinois corporation with its principal place of business in Joliet, Illinois. Lake Ridge is a citizen of Illinois for diversity of jurisdiction purposes.

6. WCJ is an Illinois corporation with its principal place of business in Joliet, Illinois. WCJ is a citizen of Illinois for diversity of jurisdiction purposes.

7. DeSanto is an individual who resides in Homer Glen, Illinois. DeSanto is a citizen of Illinois for diversity of jurisdiction purposes. DeSanto is the President and sole shareholder of Lake Ridge and WCJ.

8. The Trust is a living trust formed by DeSanto in and under the laws of the State of Illinois, and which operates out of the State of Illinois. DeSanto is the Trustee of the Trust. DeSanto and the Trust are citizens of Illinois for diversity of jurisdiction purposes.

#

**Jurisdiction and Venue**

9. Jurisdiction in this Court is proper under 28 U.S.C. §1332(a) in that the case involves a claim between citizens of different states and the amount in controversy exceeds $75,000.

10. Venue is proper in this district pursuant to 48 U.S.C. §1391(b)(1) and (2) in that the defendants all reside in this district and a substantial part of the events giving rise to CoVantage's claims took place in this district.

**Background Allegations**

11. DeSanto owns and operates WCJ, which he formed in 2009. WCJ is in the business of selling and leasing used tractor trailers and other trucks.

12. Upon information and belief, DeSanto found that some prospective WCJ customers were unable to obtain credit from traditional sources to finance the purchase of a truck from WCJ even though DeSanto believed the customers were not serious credit risks. As a result, in or about July 2012 DeSanto formed Lake Ridge to provide financing to WCJ customers who could not obtain financing from traditional lenders such as banks.

13. Initially, DeSanto funded Lake Ridge's loans out of his own funds, but as the number of customers needing financing grew, Lake Ridge and DeSanto needed to find a commercial lender to fund its financing operations.

14. In 2016, defendants entered into a borrowing relationship with LincolnWay Community Bank ("**LincolnWay**") in which LincolnWay agreed to make loans to defendants for use by Lake Ridge in providing purchase or lease financing to its customers. In 2022, CoVantage acquired substantially all of the assets of LincolnWay, including the then-outstanding loans to

Lake Ridge. After the acquisition, CoVantage continued the lending relationship with defendants initially started at LincolnWay.

15. The structure of this lending relationship has been substantially the same since 2016 under both LincolnWay and CoVantage. WCJ would sell or lease a tractor trailer to a customer in need of financing, which would be provided by Lake Ridge.

16. DeSanto, in turn, contacted LincolnWay or CoVantage to obtain loans for Lake Ridge to use in funding specific customer purchases or leases of specific tractor trailer trucks. Thus, every CoVantage loan to Lake Ridge was tied to the sale or lease of one or more specific tractor trailers, which vehicles served as security for the loan. DeSanto would tell CoVantage the terms he was looking for and identify the vehicles that would serve as collateral.

17. As part of each request for financing, DeSanto and Lake Ridge sent CoVantage by email a packet of information to evaluate the proposed transaction, including but not limited to: a bill of sale from WCJ to Lake Ridge; the lease or other financing document from Lake Ridge to the customer; a customer signed guaranty to Lake Ridge; registration and title information for the vehicle showing CoVantage was to be the first and only lien holder for the vehicle; and a lease amortization schedule.

18. Among the title and registration information provided by Lake Ridge and DeSanto on each Loan were Illinois Secretary of State – Applications for Vehicle Transactions ("**Applications**"), a sample of which is attached hereto as Exhibit A. Lake Ridge prepared the Application forms showing CoVantage as the sole lien holder and forwarded the completed form to CoVantage as part of the loan application process.

#

19. In addition, DeSanto and Lake Ridge would include in the email loan application packages copies of Certificates of Title with endorsements appearing to show that Lake Ridge owned the vehicle(s) free and clear of any liens.

20. When the loans closed, Lake Ridge was to file the Application forms with the Illinois Secretary of State and add an endorsement to the Certificates of Title reflecting CoVantage's lien to document, thus perfecting CoVantage's lien interest.

21. CoVantage evaluated and relied upon the data provided by Lake Ridge and DeSanto in determining whether to fund each loan. Of particular significance and concern, CoVantage wanted to confirm that, per the loan structure that had been in place since 2016 and as called for under the Loan Documents, it would have a first and only lien interest on any and all vehicles that were the subject of the Loan.

22. Each Loan CoVantage made to Lake Ridge was evidenced and secured by, *inter alia*, the following loan documents: (i) a Promissory Note signed by DeSanto on behalf of Lake Ridge; (ii) a Business Loan Agreement signed by DeSanto on behalf of Lake Ridge and by an officer of CoVantage; (iii) a Commercial Security Agreement signed by DeSanto on behalf of Lake Ridge; and (iv) Commercial Guarantees from DeSanto, WCJ and the Trust (collectively, the "**Loan Documents**"). For each Loan, the Loan Documents were substantially identical in form, varying only in the description of the specific amounts borrowed, dates, descriptions of collateral, etc. True and correct copies of a sample set of Loan Documents for one of the Loans are attached hereto as Exhibits B-G. Copies of all Loan Documents for all of the Loans will be made available to defendants upon request.

23. In keeping with the overall structure of the Loan transactions, and as an inducement to CoVantage to make the Loans, the Loan Documents include numerous representations that

#

CoVantage's liens on the collateral were first priority liens and that there were no other liens on the subject collateral.

24. For example, the Business Loan Agreements signed by DeSanto provide that CoVantage's obligation to fund the Loans was subject to the requirement that the representations and warranties contained in the Loan Documents were "true and correct." (Exhibit C, p. 1) Among the representations and warranties contained in the Business Loan Agreement is the following:

> **Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties **free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties.** All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used of filed a financing statement under any other name for at least the last five (5) years.

(Exhibit C, p. 1, emphasis added)

25. Under the Business Loan Agreements, Lake Ridge expressly covenanted, except for trade debt incurred in the normal course of business or as contemplated by the Loan Documents, not to "sell, transfer, mortgage, assign, pledge, lease, **grant a security interest in, or encumber** any of Borrower's assets (except as allowed in Permitted Liens)." (Exhibit C, p. 3, emphasis added)

26. The Commercial Security Agreements signed by DeSanto contained the following express representations and warranties with respect to the collateral:

> **Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interests in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all of any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.** (Emphasis in original)

#

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. **Grantor shall not pledge, mortgage, encumber or otherwise permit the Collaterals to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement.** Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided, however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, **free and clear of all liens and encumbrances except for the lien of this Agreement.** No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

(Exhibit D, pp. 1-2, emphasis added except as noted)

27. In each instance, in agreeing to make the Loans, CoVantage reasonably relied on DeSanto's representations, both in the Loan Documents and in the loan application documents, that CoVantage would have the first and only lien on the collateral for the Loan. If not for these representations, CoVantage would not have made the Loans.

28. On several occasions after Loans were funded, CoVantage asked DeSanto to provide the Applications and Certificates of Title that were to have been completed and submitted to the State. DeSanto represented that the documents had been filed with the State and would be forthcoming, but did not provide the documents.

29. Between March 2023 and March 2024, CoVantage made 57 Loans to CoVantage that have not been repaid. A list of the Loans made by Loan number, the dates of the Loans, and the amounts due and owing under the Loans is attached hereto as Exhibit H. Each of the listed Loans was documented consistent with Exhibits B through G hereto.

30. Each of the Promissory Notes, Business Loan Agreements and Commercial Security Agreements for each of the Loans provides that the following constitute events of default:

> **Payment Default.** Borrower fails to make any payment when due under this Note.
>
> **Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.
>
> **False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in an material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.
>
> **Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

(Exhibit B, p. 1; Exhibit C, p. 4, Exhibit D, 3)

31. The Loan Documents provide that, in the event of a default, CoVantage has the right to pursue a host of remedies, including but not limited to: (i) accelerating the full amount due and owing under the Notes (Exhibit C, p. 4; Exhibit D, p. 4); (ii) assembling and selling the collateral (Exhibit D, p. 4); (iii) having a receiver appointed over the collateral (*Id.*); (iv) collecting the rents, lease payments or other revenues derived from the collateral (*Id.*); (v) obtaining a deficiency judgment (*Id.*); and (vi) recovering any amounts due and owing from the guarantors. (Exhibits E-G, p. 1)

32. The Loan Documents further provide that, in the event of a default, CoVantage is entitled to recover its reasonable attorneys' fees and costs incurred as a result of the defaults. (Exhibit B, pp. 1-2; Exhibit C, p. 4; Exhibit D, p. 4; Exhibits E-G, p. 2)

#

33. Each of the Loans is in default as a result of, at a minimum, Lake Ridge's failure to make the payments of principal, interest and other charges due and owing under the Loan Documents. In addition, 35 of the 57 Loans (the "**Fraud Loans**") are also in default because DeSanto and Lake Ridge made material misrepresentations that the vehicles serving as collateral for the Fraud Loans were lien free when, in fact, they were each subject to one or more security interest in favor of another lender.

**The Fraud**

34. Central to the entire lending relationship between CoVantage and defendants was the idea that CoVantage's loans would be secured by first and only liens on the vehicles the loans were used to finance. The purpose of the Loans was to provide Lake Ridge with funds to allow it to provide financing to its customers who sought to purchase or lease vehicles from WCJ. Under this structure, the customers would make their monthly payments to Lake Ridge, and Lake Ridge would, in turn, make its monthly payments to CoVantage. If Lake Ridge defaulted on its obligations and CoVantage did not get paid, it had the collateral – the trucks – as security.

35. The critical role this collateral played in CoVantage's loan program with defendants is reflected in the language included in the Loan Documents for each and every Loan, as described above, that repeatedly affirmed that CoVantage was to have the only lien on the vehicles that were being financed by Lake Ridge.

36. In each and every case, before approving a Loan, CoVantage insisted on being provided documentation regarding the vehicles that would become the collateral for the Loan, including but not limited to VIN number and title and registration documentation reflecting CoVantage's lien and the absence of any other lien.

#

37. In response, DeSanto and Lake Ridge provided CoVantage documentation that, in each and every instance, made it appear that CoVantage would have the only lien on the vehicle being financed once the Loan closed. Included in this documentation was a completed and signed Application to be submitted by Lake Ridge to the Illinois Secretary of State upon closing of the Loan and a Certificate of Title showing that Lake Ridge held clean title to the vehicles.

38. CoVantage reasonably relied on Lake Ridge and DeSanto's representations regarding the status of title to the vehicles that served as CoVantage's collateral. DeSanto, as President of WCJ, which owned the vehicles, and Lake Ridge, which was leasing the vehicle to its customers, was in a far better position than CoVantage to assess whether there were other liens on the vehicles.

39. Without a first and only lien on the vehicles that were the subject of the Loans, CoVantage would simply not have made the Loans.

40. In or about April 2024, Lake Ridge began defaulting on the Loans. Thereafter, CoVantage was contacted by counsel for defendants and advised that Lake Ridge and WCJ were in financial distress and could not meet their Loan obligations. CoVantage was advised that Lake Ridge and WCJ would be working with their various creditors to liquidate their assets

41. It was in connection with these communications that CoVantage learned for the first time that, contrary to the express representations made by Lake Ridge and DeSanto in the Loan Documents and in the documentation provided to CoVantage as part of every Loan application, the collateral on some of the Loans was also subject to lien claims by other lenders. Some of these third-party liens appear to take priority over CoVantage's liens.

42. North Mill Equipment Finance, LLC ("**North Mill**") sold many of the vehicles that were the subjects of the Loans to WCJ. As a result, North Mill appeared on many of the

#

Certificates of Title. As part of those loan applications, however, Lake Ridge and DeSanto provided CoVantage with copies of the Certificates of Title indicating that ownership of the vehicles had been transferred to WCJ and, in turn, to Lake Ridge.

43. Notwithstanding these representations, Lake Ridge and DeSanto never filed the documentation required to remove North Mill's lien and replace it with CoVantage's lien on the Secretary of State's official title records for at least 41 vehicles previously subject to North Mill liens. In addition, North Mill now claims that it never signed the transfers of title reflected on many of the Certificates of Title DeSanto and Lake Ridge submitted to CoVantage, suggesting that DeSanto forged North Mill's signature.

44. Hitachi Capital and Engs Commercial n/k/a Mitsubishi HC Capital ("**Hitachi**") provided floor plan financing to WCJ on or about March 3, 2014. In connection with this financing, WCJ gave Hitachi a security interest in, among other things, its inventory.

45. Some of the tractor trailer inventory that was subject to Hitachi's lien was sold or leased to customers who obtained financing provided by Lake Ridge. Lake Ridge then included these vehicles in the collateral pledged to CoVantage to secure the Loans. Even though these vehicles were all subject to Hitachi's blanket lien, Lake Ridge and DeSanto falsely represented to CoVantage – in the Loan Documents, in the Applications and in other documents submitted by Lake Ridge and DeSanto – that the vehicles were lien free.

46. Attached hereto as Exhibit I is a list of all of the Fraud Loans, including the Loan number, the party (North Mill or Hitachi) claiming the senior lien, the number of vehicles on each Fraud Loan in which the priority of CoVantage's lien has been challenged, and the amount due and owing on the Fraud Loan.

#

47. CoVantage reasonably relied on Lake Ridge and DeSanto's representations in agreeing to make the Fraud Loans.

## COUNT ONE
### (Breach of Contract against Lake Ridge)

48. The allegations set forth in paragraphs 1 through 47 are incorporated herein by this reference.

49. The Loan Documents for each of the Loans are valid and binding contracts between CoVantage and Lake Ridge.

50. CoVantage performed all of its obligations under the Loan Documents, including but not limited to by funding the Loans.

51. Lake Ridge breached the Loan Documents on the Loans by, among other things, (i) failing to pay the amounts due and owing under the Promissory Notes on each Loan beginning in or about April 2024; (ii) making misrepresentations in the Loan Documents of the Fraud Loans that there were no other liens on the collateral applicable to those loans and that CoVantage's lien was the only lien against the collateral; (iii) failing to comply with its contractual obligation not to allow any other liens against the subject collateral on the Fraud Loans; and (iv) becoming insolvent.

52. CoVantage has been damaged as a direct and proximate result of Lake Ridge's breaches in an amount in excess of $5.4 million as of November 4, 2024.

53. Pursuant to the terms of the Loan Documents, CoVantage is entitled to recover from Lake Ridge its attorneys' fees and costs reasonably incurred by CoVantage as a result Lake Ridge's breaches.

#

**WHEREFORE**, CoVantage prays that the Court enter judgment in its favor and against Lake Ridge in an amount to be determined at trial, that the Court award CoVantage its reasonable attorneys' fees and costs, and that the Court grant such other relief as it deems just and proper.

### COUNT TWO
### (Breach of Contract against DeSanto)

54. The allegations set forth in paragraphs 1 through 47 are incorporated herein by this reference.

55. As an inducement for CoVantage to make and fund the Loans, DeSanto executed a Commercial Guaranty for each Loan (the "**DeSanto Guarantees**"), a true, correct and complete sample of which is attached hereto as Exhibit E.

56. The DeSanto Guarantees are valid and binding contracts between CoVantage and DeSanto.

57. CoVantage has fulfilled all of its obligations under the DeSanto Guarantees.

58. DeSanto has breached the DeSanto Guarantees by failing and refusing to pay the balance due and owing on the corresponding Promissory Notes upon default thereof.

59. CoVantage has been damaged as a direct and proximate result of DeSanto's breaches of the DeSanto Guarantees in an amount in excess of $5.4 million as of November 4, 2024. In addition, pursuant to page 2 of the DeSanto Guarantees, CoVantage is entitled to recover its reasonable attorneys' fees and costs incurred as a result of the breach.

**WHEREFORE**, CoVantage prays that the Court enter judgment in its favor and against DeSanto in an amount to be determined at trial, that the Court award CoVantage its reasonable attorneys' fees and costs, and that the Court grant such other relief as it deems just and proper.

#

## THREE
### (Breach of Contract against WCJ)

60. The allegations set forth in paragraphs 1 through 47 are incorporated herein by this reference.

61. As an inducement for CoVantage to make and fund the Loans, WCJ executed a Commercial Guaranty for each Loan (the "**WCJ Guarantees**"), a true, correct and complete sample of which is attached hereto as Exhibit F.

62. The WCJ Guarantees are valid and binding contracts between CoVantage and WCJ.

63. CoVantage has fulfilled all of its obligations under the WCJ Guarantees.

64. WCJ has breached the WCJ Guarantees by failing and refusing to pay the balance due and owing on the corresponding Promissory Notes upon default thereof.

65. CoVantage has been damaged as a direct and proximate result of WCJ's breaches of the WCJ Guarantees in an amount in excess of $5.4 million as of November 4, 2024. In addition, pursuant to page 2 of the WCJ Guarantees, CoVantage is entitled to recover its reasonable attorneys' fees and costs incurred as a result of the breach.

**WHEREFORE**, CoVantage prays that the Court enter judgment in its favor and against WCJ in an amount to be determined at trial, that the Court award CoVantage its reasonable attorneys' fees and costs, and that the Court grant such other relief as it deems just and proper.

## COUNT FOUR
### (Breach of Contract against the Trust)

66. The allegations set forth in paragraphs 1 through 47 are incorporated herein by this reference.

#

67. As an inducement for CoVantage to make and fund the Loans, the Trust executed a Commercial Guaranty for each Loan (the "**Trust Guarantees**"), a true, correct and complete sample of which is attached hereto as Exhibit G.

68. The Trust Guarantees are valid and binding contracts between CoVantage and the Trust.

69. CoVantage has fulfilled all of its obligations under the Trust Guarantees.

70. The Trust has breached the Trust Guarantees by failing and refusing to pay the balance due and owing on the corresponding Promissory Notes upon default thereof.

71. CoVantage has been damaged as a direct and proximate result of the Trust's breaches of the Trust Guarantees in an amount in excess of $5.4 million as of November 4, 2024. In addition, pursuant to page 2 of the Trust Guarantees, CoVantage is entitled to recover its reasonable attorneys' fees and costs incurred as a result of the breach.

**WHEREFORE**, CoVantage prays that the Court enter judgment in its favor and against the Trust in an amount to be determined at trial, that the Court award CoVantage its reasonable attorneys' fees and costs, and that the Court grant such other relief as it deems just and proper.

## COUNT FIVE
### (Fraud against DeSanto)

72. The allegations set forth in paragraphs 1 through 47 are incorporated herein by this reference.

73. DeSanto made, and caused others to make on his behalf, false statements of material fact to CoVantage regarding the lien status of the vehicles that were to serve as collateral on the Fraud Loans including but not limited to the following statements:

    a. The representations in the Business Loan Agreements he signed that the vehicles serving as collateral on the Fraud Loans were "free and clear of all Security

#

        Interests," and that Lake Ridge "has not executed any security documents or financing statements relating to such properties";

    b. The representations in the Commercial Security Agreements he signed that "Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement"; and

    c. The representations in the Applications, Certificates of Title and other documents he submitted or caused to be submitted in the application process that falsely indicated there were no other lien claims on the vehicles and that CoVantage would be the only lien holder of the collateral securing the Fraud Loans.

74. DeSanto knew these representations were false at the time he made them or caused them to be made. As the President of WCJ and Lake Ridge, and the person overseeing their day-to-day operations, DeSanto was intimately aware of the existing North Mill liens and the need for them to be released in order for the representations made to CoVantage to be true and of the existing floor plan financing agreement and related security agreement with Hitachi that placed a prior lien on any vehicle that had been a part of WCJ's inventory.

75. DeSanto made these representations as part of a scheme designed and intended to cause CoVantage to rely on his false assurances so that he could obtain the financing necessary to fund Lake Ridge and WCJ's sales operations. Based on the prominent inclusion of these representations in the Loan Documents and CoVantage's insistence on including title and lien documentation in the loan application materials it required before approving and funding a Loan, DeSanto knew with certainty that CoVantage's Loan approval process was reliant upon the title and lien status information he provided it.

\#

76. CoVantage did, in fact, rely on DeSanto's representations that CoVantage would be the sole lien holder on the vehicles that served as collateral for its Loans in approving and closing on the Fraud Loans.

77. CoVantage's reliance, however, was not limited to just the Fraud Loans. All of the Loans were part of a larger lending relationship between CoVantage and DeSanto and his companies. The relationship was based on CoVantage's trust in DeSanto and the loans he brought to CoVantage.

78. The first of the Fraud Loans, loan number 422730-0554, closed on June 7, 2023. Loan 422730-0554 was secured by liens on five tractor trailers that are subject to other liens. Had CoVantage learned of this fact in June 2023, it would not have made Loan 422730-0554 or any of the other Loans and would not now be facing losses on the non-Fraud Loan Loans.

79. CoVantage has been damaged as a direct and proximate result of DeSanto's fraud in an amount to be determined at trial.

80. DeSanto's actions in misrepresenting the presence of other liens on the vehicles offered as collateral on the Fraud Loans was willful and wanton and done with complete disregard for the harm that could be caused to CoVantage if Lake Ridge defaulted on the Fraud Loans. As a result, the Court should award CoVantage punitive damages in an amount sufficient to punish DeSanto for his conduct and to deter him from engaging in similar conduct in the future.

**WHEREFORE**, CoVantage prays that the Court enter judgment in its favor and against DeSanto in an amount to be determined at trial, that the Court award CoVantage punitive damages, and that the Court grant such other relief as it deems just and proper.

\#

Dated: December 6, 2024            **COVANTAGE CREDIT UNION**

By:    /s/ Richard M. Hoffman
       One of His Attorneys

Richard Hoffman
rhoffman@cshlegal.com
Cohen, Salk & Hoffman, P.C.
630 Dundee Road, Suite 120
Northbrook, Illinois 60062
847.480.7800 - Telephone
847.480.7882 – Facsimile

#